UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| MARYANNE DENNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | Civil Action No: SA-05-CA-184-XR |
| ) | |
| TEXAS DEPARTMENT OF CRIMINAL ) | |
| JUSTICE, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

On this date, the Court considered Defendant's Motion for Judgment Notwithstanding Verdict (docket no. 60), Plaintiff's Response (docket no. 63), and Defendant's Reply (docket no. 64). After careful consideration, the Court will deny the motion.

**Facts & Procedural Background**

Plaintiff Maryanne Denner brought suit against Defendant Texas Department of Criminal Justice ("TDCJ"), her former employer, alleging sexual harassment and retaliation claims under Title VII. On summary judgment, this Court granted judgment in favor of TDCJ on Plaintiff's sexual harassment claim on the basis that Plaintiff failed to raise a material fact issue on hostile work environment. The Court concluded, however, that fact issues remained with regard to Plaintiff's retaliation claim. Accordingly, Plaintiff's retaliation claim was tried to a jury. The jury returned a verdict in favor of Plaintiff, finding that Plaintiff was constructively discharged and that Defendant retaliated against her for engaging in protected activity. The jury awarded $75,000 in mental anguish damages and $45,000 in back pay. TDCJ now moves for judgment notwithstanding the verdict on

1

four grounds: (1) Plaintiff did not suffer an adverse employment action because she resigned voluntarily; (2) Plaintiff failed to establish a causal link between her protected activity and the decision to recommend her termination; (3) the jury's award of $75,000 in mental anguish damages is unsupported by the evidence and is excessive; and (4) the jury's award of $45,000 in back pay damages is unsupported by the evidence and is excessive.

## Standard of Review

A motion for judgment as a matter of law should be granted if "there is no legally sufficient evidentiary basis for a reasonable jury to find for a party." FED. R. CIV. P. 50(a). Thus, "if reasonable persons could differ in their interpretations of the evidence, then the motion should be denied." *Bryant v. Compass Group USA, Inc.*, 413 F.3d 471, 475 (5th Cir. 2005). "A post-judgment motion for judgment as a matter of law should only be granted when the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict." *Id.* The jury's verdict is afforded great deference. *Id.* Thus, when evaluating the sufficiency of the evidence, the Court views all evidence and draws all reasonable inferences in the light most favorable to the verdict. *Id.* More specifically, this Court should give credence to the evidence favoring the non-moving party and any uncontradicted or unimpeached evidence supporting the moving party where such evidence comes from disinterested witnesses. *Raggs v. Miss. Power & Light*, 278 F.3d 463, 467 (5th Cir. 2002) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)).

Once a case has been fully tried on its merits, the Court does not focus on the *McDonnell Douglas* burden-shifting scheme. *Bryant*, 413 F.3d at 475-76. Instead, the inquiry is whether the record contains sufficient evidence to support the jury's ultimate findings. *Id.* at 476. Thus, the

Court will not "parse the evidence into discrete segments corresponding to a prima facie case, an articulation of a legitimate, nondiscriminatory reason for the employer's decision, and a showing of pretext," but must instead determine whether the record contains sufficient evidence for a reasonable jury to determine that the defendant's stated reason for terminating the plaintiff was pretext or that, while true, it was only one of the reasons for its conduct, and another "motivating factor" was retaliation. *Id.* To satisfy this burden, the plaintiff must offer " some evidence ... that permits the jury to infer that the proffered explanation was a pretext for discrimination. The trier of fact may not simply choose to disbelieve the employer's explanation in the absence of any evidence showing why it should do so." *Pineda v. United Parcel Service, Inc.*, 360 F.3d 483, 487 (5th Cir. 2004) (quoting *Swanson v. General Services Admin.*, 110 F.3d 1180, 1185 (5th Cir.1997)). The jury's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff, but it is permissible for the jury to infer the ultimate fact of discrimination from the falsity of the employer's explanation. *Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133, 146-47 (2000).

In addition, a plaintiff may demonstrate unlawful retaliation by demonstrating disparate treatment of similarly situated employees. *See Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir.1990). To raise an inference of unlawful retaliation, the plaintiff may compare her treatment to that of nearly identical, similarly situated individuals. *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir.1995). To establish disparate treatment, the plaintiff must show that the defendant gave preferential treatment to another employee under "nearly identical" circumstances. *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001).

**Analysis**

**A. Constructive Discharge**

TDCJ argues that Plaintiff cannot establish that she suffered an adverse employment action because she voluntarily resigned "for personal reasons." TDCJ asserts that, after a hearing on June 23, 2003, Plaintiff was recommended for termination for violating TDCJ Rule 42. After she was recommended for dismissal, Plaintiff asked to mediate the recommendation pursuant to TDCJ policy. But, TDCJ argues, during the course of the mediation, on July 9, 2003, Plaintiff "pre-empted the termination process and voluntarily chose to resign her position 'for personal reasons.'" Essentially, Defendant argues that because Plaintiff did not use the grievance process available to her and instead chose to resign to avoid termination that would make it difficult for her to obtain future employment, she was not constructively discharged as a matter of law.

The Fifth Circuit has recognized that a plaintiff may prove constructive discharge by demonstrating that she was forced to choose between resigning and being fired. *Faruki v. Parsons*, 123 F.3d 315, 318 (5th Cir. 1997). TDCJ argues that Plaintiff did not actually face that choice, given that Warden Horton, Warden Prasifka, and Warden Treon lacked authority to unilaterally terminate an employee, and the recommendation of dismissal would have to be approved up the chain of command.

Plaintiff testified that, after an internal investigation, she received a disciplinary hearing on June 23, 2003, presided over by Warden Prasifka. She stated that Prasifka told her that he had to find her guilty because she was a threat. Tr. 244. She testified that Prasifka did not appear to read the statement from Mr. Moreno that Plaintiff had turned in an IOC form reporting a relationship with an inmate, and that Prasifka refused to call Mr. Moreno. Tr. 245. At the end of the hearing, Plaintiff

testified that Prasifka told her he was recommending dismissal because he had to find her guilty and told her that she had to turn in her i.d. Tr. 249. He held his hand out, and she gave him her i.d. *Id.* Further, as soon as Plaintiff walked out of the office, Warden Stephenson was there and told her he needed to take her to the back to get her stuff. *Id.* Plaintiff testified that, despite the fact that he had not been in the hearing, Warden Stephenson already knew that she had been recommended for termination. Tr. 250. Plaintiff packed up her things, and Stephenson then walked her outside. Tr.250.

     Plaintiff requested mediation, which was conducted by Warden Treon on July 9. Plaintiff testified that mediation was "[f]or you to talk to another party and to try to mediate you getting your job back." Tr. 251. Plaintiff testified that Warden Treon told her he needed to take a break to make a phone call, and afterwards, he came back and told her "you have three ways to resign or else you'll be fired." Tr. 251. She testified that "he said the best one to do is to resign for personal reasons, because if I resign in lieu of disciplinary," then they "wouldn't be able to tell anybody, and I could get a job. That was my best way to do it because that would be the only way I could get a job." Tr. 252. She said her choice was "[e]ither that or be fired." *Id.* When asked if Treon could have fired her that day, she answered yes. Tr. 252. She stated that it did not have to go through more of the process "up the ladder." *Id.* She also stated that Treon told her he was going to recommend termination at that point. Tr. 252. Plaintiff then resigned for personal reasons, stating that she did not have any choices. Tr. 252-53. Plaintiff testified that, after the mediation, she was terminated, and that was the end of the process in terms of appeals or grievances. Tr. 255. Plaintiff later testified again that she was essentially told that she had no options but to resign or be fired. Tr. 348. She testified that she did not know she could grieve the decision to fire her. Tr. 348. She stated that

5

Warden Treon told her that they had reached an impasse. Tr. 348.

Warden Thomas Prasifka testified that he was the reprimanding authority for Plaintiff's disciplinary hearing. Tr. 688. He found Plaintiff guilty of violating Rule 42 and recommended termination, the most severe punishment for the violation. Tr. 700. Warden Treon conducted the mediation, and concurred with Warden Prasifka's recommendation to dismiss. Tr. 796. He testified that he made one offer to Plaintiff at the mediation– resign for personal reasons. Tr. 763. He testified that he advised Plaintiff that if she refused to accept that offer, the mediation would go to an impasse. Tr. 764-66. When mediation reaches an impasse, he stated, the dismissal recommendation process goes forward, meaning it would start going up through the chain of command. Tr. 799. Warden Treon testified that only someone at least the rank of division director has the ultimate authority to approve dismissal. Tr. 797.

The Court finds that there was sufficient evidence for the jury to find that Plaintiff was constructively discharged. The evidence establishes that Plaintiff's mediation had reached an impasse and that Warden Treon would uphold the decision to recommend termination. All that remained at that point was for the decision to be approved "up the chain of command." There was no evidence that any further investigation would have occurred or that the decision would have likely been overturned. Moreover, the jury could disbelieve Warden Treon's testimony and instead believe Plaintiff's testimony regarding what she was told by Warden Treon. Thus, even if Warden Treon did not have the actual ultimate authority to terminate Plaintiff and even if the recommendation to dismiss might have been overturned at some later point, the jury could reasonably have found based

on the evidence that a reasonable person in Plaintiff's position would have felt compelled to resign.[1]

**B. Causation**

TDCJ argues that Plaintiff failed to establish a causal link between her protected activity and her discharge. In retaliation cases where the defendant has proffered a nondiscriminatory purpose for the adverse employment action, the plaintiff has the burden of proving that "but for" the discriminatory purpose she would not have been terminated. *Pineda*, 360 F.3d at 487; *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 685 (5th Cir. 2001) (plaintiff "must demonstrate that he would not have been terminated 'but for' engaging in the protected activity"); *Long v. Eastfield College*, 88 F.3d 300, 305 n.4 (5th Cir. 1996) ("[E]ven if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct."). A causal link is established when the evidence demonstrates that the employer's decision to terminate was based in part on knowledge of the employee's protected activity. *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001). The causal connection may be shown by direct evidence or reasonable inferences that may be drawn from circumstantial evidence.

TDCJ argues that Plaintiff failed to establish that its justification for its employment decision was pretextual. The parties agreed that this case was tried solely as a pretext case, and not a mixed

---

[1]The Court notes that the Fifth Circuit has held that an employment action that does not affect job duties, compensation, or benefits, is not an adverse employment action for purposes of retaliation claims. However, in June of this year, the Supreme Court distinguished between discrimination and retaliation claims and held that application of Title VII's anti-retaliation provision is not limited to an employer's actions that affect the terms, conditions, or status of employment or that occur at the workplace. *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006). Thus, under *White*, a plaintiff must now show only that a reasonable employee would have found the challenged action materially adverse, meaning that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Id.* at 2415.

motive case. Tr. 871. Under that framework, the employee's ultimate burden is to prove that the employer's stated reason for the adverse action was merely a pretext for the real, retaliatory purpose. *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005). As noted, the standard of proof for causation is that the adverse action would not have occurred "but for" the protected conduct. *Id.*

The evidence demonstrates that Plaintiff was a long-time employee of TDCJ, and that at the time of her termination she was a gang sergeant. Prior to the discipline in question here, she had no disciplinary actions on her record.[2] Plaintiff testified that Captain Samora had made inappropriate remarks to her, and right after she complained about Samora's behavior to Warden Alvarez, she noticed a change in Warden Stephenson's[3] behavior toward her. Tr. 175. He ordered her to conduct inappropriate searches of male offenders. Tr. 175. After Warden Alvarez left and Warden Horton became the head warden in September 2002, Captain Samora made additional inappropriate remarks. Tr. 177. When she reported these remarks to Warden Stephenson, he laughed. Tr. 178. Plaintiff filed a written EEO complaint of sexual harassment against Captain Samora in September 2002. Warden Stephenson sent the complaint on to the EEO office. Tr. 189. Plaintiff testified that Warden Stephenson told her the complaint was "bullshit" and "wasn't going anywhere." Tr. 190. Plaintiff stated that "things changed" after she filed the complaint. Tr. 191. Warden Stephenson made her rewrite a report "over and over and over and over again." Tr. 193. Warden Stephenson also told Plaintiff that he wanted her to start documenting all the offenders that she talked to, which she believed was a bad idea. Tr. 193-94. Plaintiff further testified that Warden Stephenson would not

---

[2]Though a disciplinary action was instituted against Plaintiff by Captain Samora, Plaintiff grieved the disciplinary and it was eventually overturned. Accordingly, it was not on her record, and Plaintiff's alleged Rule 42 violation was her first violation for disciplinary purposes.

[3]Warden Stephenson was the assistant warden.

let her use the computers and started monitoring her mail, and that he told her he did not want her to have inmates in her office. Tr. 196, 198. Jackie Gothart, another TDCJ employee, testified that, after Warden Alvarez left, Warden Stephenson was no longer as cordial or polite to Plaintiff as he had been. Tr. 443. She stated that Stephenson would yell at Plaintiff in front of inmates and made her rewrite a form five or six times. Tr. 444. In October 2002, Plaintiff filed a retaliation claim against Warden Stephenson.

Sometime in November or December 2002, Benavides's mother got a flat tire and asked to stay the night at Plaintiff's house. Tr. 202. Plaintiff allowed her and Benavides's sister to stay, and did not report it to the warden. Plaintiff testified that she had filed a written notice documenting the fact that she knew the Benavides family when Warden Alvarez was the warden and that she had verbally informed Warden Horton and Warden Stephenson of the relationship. Tr. 154, 174, 179, 203, 351. In December 2002 or January 2003, Charlie Mann began an OIG investigation of Plaintiff. Tr. 573. Warden Horton testified that he first learned about the Benavides family visiting Plaintiff's home in January 2003. Tr. 605. He was concerned, but did not do anything right away other than submit a request to the classification office to have Benavides shipped to a different facility. Tr. 608. Warden Horton did not ask Plaintiff what was going on and said it was not a threat to security at the time because it was "only hearsay" from Sylvia Ontiveros. Tr. 611, 620.

On March 2, Warden Horton followed the Benavides family after they visited Luis Benavides at the facility. Tr. 646. Warden Horton parked across the street and observed the family go into Plaintiff's house. Tr. 647. Horton opened an OIG investigation on Monday, March 3, 3003. Tr. 651. Mann interviewed Plaintiff on March 3, 2003. Tr. 357. Warden Horton sat in on the interview. Tr. 663. In early March 2003, Benavides was transferred to another facility. Tr. 207. In April 2003,

Plaintiff was written up for assault and insubordination to Lt. Moore. Tr. 223. Captain Samora was the charging official and wrote out a disciplinary for the incident. Tr. 227, 400. She grieved the discipline, and after Moore gave a revised statement, the discipline was overturned. Tr. 235. On April 4, 2003, Warden Horton gave Plaintiff an "exceeds standards" evaluation, including with regard to security. Tr. 653, 662. On May 9, 2003 Plaintiff filed a sexual harassment and retaliation claim with the EEOC. Mann issued his report on the investigation on May 24, 2003. On June 18, Plaintiff was administered a disciplinary for failing to notify her warden of her relationship with an offender's (Benavides) family. On June 23, 2003, Warden Prasifka conducted her disciplinary hearing and recommended dismissal, the most severe sanction for the violation. Tr. 700. Because this was a first violation for Plaintiff, Prasifka could have recommended only six to nine months probation. Tr. 701. Warden Prasifka testified that he and Warden Stephenson spoke before the hearing. Tr. 702. Warden Treon conducted a mediation on July 9, 2003, and concurred in the dismissal recommendation.

The Court concludes that there was sufficient evidence from which the jury could find that TDCJ's stated reason for the termination was pretextual. Plaintiff was a seventeen-year employee of TDCJ who had no disciplinary charges brought against her until after she filed her complaints of sexual harassment and retaliation. Plaintiff offered some evidence that she did in fact comply with Rule 42's vague requirements. There was evidence that she informed Warden Alvarez of her relationship and that he initialed the document and placed it in her personnel file. Ms. Wear testified that the Benavides family came to visit Plaintiff while she was living with Warden Alvarez and that Warden Alvarez knew of the visit because he had told her how good the food they brought had been. Tr. 836. Plaintiff also testified that she verbally informed the other wardens of her relationship with

10

the family, and no one had questioned it or told her to stop spending time with the family. Plaintiff testified that the family gave her gang information, and Ms. Wear testified that at one training, gang officers were encouraged to use family members to get information. Tr. 837. Ms. Wear testified that she had never heard anyone say that an inmate's family should not visit or spend the night at an employee's home, and that it would not be a violation of Rule 42. Tr. 838. Though TDCJ discharged Plaintiff for violating Rule 42, Warden Prasifka admitted that there was no evidence that Plaintiff's relationship with the Benavides family jeopardized anyone's safety or integrity. Tr. 705. Warden Prasifka stated only that "the potential is there." Tr. 705. In addition, though Warden Horton was aware of the relationship as early as January 2003, he did not discuss the matter with Plaintiff or instruct her to stop spending time with the Benavides family. Ms. Wear testified that, if there was a true security threat, Warden Horton could have contacted the regional office to have Benavides transferred right away. Instead, Warden Horton simply submitted a request to the classification office, and Benavides was not transferred until early March 2003. In addition, though Plaintiff's behavior was an alleged security threat, Warden Horton gave Plaintiff an "exceeds standards" evaluation on all areas, including security, in April 2003. Further, Plaintiff was allowed to keep working until July 2003, despite being an alleged security risk. Based on this evidence, the jury could reasonably conclude that the proffered reason for Plaintiff's discharge – a violation of Rule 42 – was pretextual.

      TDCJ further argues that Plaintiff fails to establish causation because she failed to establish that the decisionmakers – Wardens Prasifka and Treon – had knowledge that Plaintiff had engaged in protected activity. However, there was direct evidence that both decisionmakers were aware of her complaint regarding Captain Samora. Warden Prasifka, who conducted Plaintiff's disciplinary

hearing and recommended her termination, testified that he learned of Plaintiff's complaint against Captain Samora at the disciplinary hearing, before he made the dismissal recommendation, because Plaintiff mentioned it, though he stated it had no bearing on his decision. Tr. 724-26. Warden Treon stated that he was "vaguely aware" of some kind of complaint against Captain Samora, and that when he got to the regional office, he got there "on the tail end of all of this." Tr. 803. He also testified that Plaintiff mentioned something about Captain Samora at the mediation, and that he spoke to someone on the phone about Samora around the time of the mediation (though he was unsure whether he called after the fact or before the fact). Tr. 803. Thus, there was direct evidence that both decisionmakers were aware that Plaintiff had filed an EEO complaint against Captain Samora before they issued their decisions.

In addition, there was circumstantial evidence from which the jury could infer that Warden Prasifka was aware of Plaintiff's protected activity and that there was a causal connection between that knowledge and her discharge. Warden Prasifka testified that he did not know that Plaintiff had filed a retaliation complaint against Warden Stephenson at the time he recommended Plaintiff's dismissal. Tr. 727. However, Warden Prasifka admitted that he spent some time (approximately twenty minutes) with Warden Stephenson just before the hearing. Further, though this was Plaintiff's first violation, Warden Prasifka recommended the harshest possible discipline – discharge – rather than a vast range of lesser punishments. Warden Prasifka testified that he only took a few minutes to look at the investigation report before he started the hearing. Tr. 690. He also refused to call Mr. Moreno to corroborate Plaintiff's testimony that she had filed a report documenting her relationship with the Benavides family, and that Moreno had placed the document in her personnel file. In addition, he recommended dismissal even though he did not know whether Plaintiff had ever

been told to stop seeing the Benavides family and even though there was no evidence that the relationship actually jeopardized security or Plaintiff's integrity. Moreover, Plaintiff's testimony indicates that Warden Stephenson already knew the outcome of the disciplinary hearing because he was "right there" when they walked out of the hearing and he told her he needed to take her to the back to get her stuff. Accordingly, the jury could infer that Warden Stephenson and Warden Prasifka had discussed what the outcome of the hearing would be in their meeting before the hearing took place.

Although Warden Treon stated he was aware of Plaintiff's complaint against Captain Samora, Warden Treon testified that he was not aware of Plaintiff's retaliation complaint against Warden Stephenson. Tr. 803-04. However, despite the fact that Plaintiff had no prior disciplinaries, Warden Treon concurred in the dismissal recommendation, meaning that he did not find Plaintiff, a seventeen-year veteran of TDCJ, to be "salvageable." Warden Treon did not consider a lesser discipline level for Plaintiff even though it was her first offense and even though he knew that Warden Alvarez did not have a problem with Plaintiff and Benavides being on the same unit.

In addition, the jury could consider the evidence that Catherine Garcia, a TDCJ correctional officer, was charged with a violation of Rule 42a, which was a more serious violation, but was returned to work after mediation before Warden Treon. Garcia failed to notify the warden that her long-time boyfriend/husband had become an offender and she was visiting him while he was incarcerated. Garcia was terminated, but after a dismissal mediation by Warden Treon, she was brought back with only a suspension. Tr. 254. Warden Treon distinguished the Garcia case because Garcia had had a long-standing relationship with the offender before he became an offender, but then failed to report it by giving written notice of the relationship. Tr. 774. Warden Treon stated this was

very different from an employee who develops a relationship with somebody who is actually in the penitentiary at the time the relationship developed because it shows that TDCJ cannot trust the employee. *Id.* However, the jury could conclude that Garcia's blatant violation of the rule by not reporting at all was worse than Plaintiff's violation because Plaintiff did submit notification both in writing and verbally. Warden Treon also offered inconsistent reasons for upholding the dismissal recommendation. He stated that Plaintiff had engaged in "what really appears to be highly questionable behavior with the offender inside the penitentiary." Tr. 774. Warden Treon admitted, however, that Plaintiff was not discharged for having an improper relationship. Warden Treon also questioned whether Plaintiff had actually ever placed the notification document in her personnel file. Tr. 779. However, Warden Treon agreed that Mr. Moreno was credible. Thus, Warden Treon's rationales for concurring in the dismissal were inconsistent and differed from the reasons asserted by Warden Prasifka – that Plaintiff did not advise the warden of the change in the relationship (that the family was visiting her at home and staying at her home).

Viewing the evidence in the light most favorable the verdict, the Court finds that Plaintiff adduced sufficient evidence to support the jury's finding of retaliation.

**C. Mental Anguish**

TDCJ argues that the jury's award of $75,000 for mental anguish is unsupported by the record and should be reduced. Compensatory damages for emotional distress may only be awarded when specific evidence of actual harm is introduced. *Williams v. Trader Pub Co.*, 218 F.3d 481, 486 (5th Cir. 2000). However, the Fifth Circuit has upheld mental anguish awards when the plaintiff's own testimony as to the extent and nature of the damages is the only evidence on the subject. *See id.* at 486 (holding that plaintiff's testimony was sufficient to support the jury's verdict where

plaintiff testified regarding her lack of sleep, weight loss, and new smoking habit); *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998) (holding that plaintiff's testimony that she experienced loss of sleep, anxiety, and marital problems was sufficient to support the district court's mental anguish award).

Here, Plaintiff testified that after she left the unit, she moved home with her parents and "cried for weeks." Tr.255. She testified that her reputation was ruined and that she was humiliated. Tr. 257. She did not see a psychologist or psychiatrist because she did not have any money or health insurance. Tr. 257. Once she got insurance, she went to a doctor and he gave her medication to help her sleep. Tr. 257. She stated that she had problems sleeping then and continues to have problems sleeping. Tr. 257. She testified that she was traumatized, and that she did not eat well, had horrible stomach problems, and was irritable. Tr. 258, 268. She testified that she lost patience with her son and lost her self-confidence and control. Tr. 258. She stated that she did not want to do things by herself anymore, and that she was still very nervous about anything she did at work. Tr. 258. She also testified that the discharge affected her high blood pressure, and this resulted in headaches and nose bleeds. Tr. 267.

Plaintiff's mother also testified at the trial. She testified that Plaintiff called her after she had been discharged, and that she was "desperate, very upset, crying." Tr. 430. Plaintiff's mother testified that Plaintiff had "always been upbeat" but now "she was depressed all the time, and is still depressed" and "wouldn't go out with friends." Tr. 432. Plaintiff's mother testified that she was "like traumatic," that she wanted her parents to go with her to events, and that she was not as social anymore. Tr. 433. She testified that Plaintiff was not able to sleep "most nights" and that she had not had trouble sleeping before. Tr. 434-35. She testified that Plaintiff took Tylenol PM and went

15

to Mexico to get medication for her blood pressure and to be able to sleep. Tr. 435.

TDCJ argues that "[t]he few symptoms of which Plaintiff complained were not sufficiently severe to justify an award of $75,000." TDCJ asserts that the emotional distress suffered by Plaintiff can at best be characterized as hurt feelings, anger, and frustration, none of which was severe enough to prevent her from attending school and completing her degree. Accordingly, TDCJ contends that Plaintiff's mental anguish damages should be reduced to zero.

Plaintiff's evidence establishes more than that she suffered hurt feelings, anger, and frustration. As Defendant acknowledges, mental anguish damages may be appropriate where the plaintiff suffers sleeplessness, anxiety, stress, and humiliation. Plaintiff testified that she was humiliated and that she suffered sleeplessness, irritability, and nervousness. Plaintiff need not have been incapacitated from her symptoms to recover mental anguish damages. In addition, the $75,000 is within the acceptable range of damages. *See Thomas v. Tex. Dep't of Criminal Justice*, 297 F.3d 361, 369-70 (5th Cir. 2002). Accordingly, the Court declines to reduce the award.

**D. Back Pay**

TDCJ argues that the jury's award of $45,000 in back pay is unsupported by the evidence and should be reduced. TDCJ asserts that the evidence establishes at most that Plaintiff was entitled to $36,207 in back pay. Further, TCDJ asserts, since Plaintiff was in school for eleven of the thirteen months she was unemployed, her back pay should be reduced to only $4,360, which represents the two months she was not working or attending school.

Back pay is intended to compensate the victim for economic losses sustained as a result of the Title VII injury. The Court declines to reduce Plaintiff's back pay award for the time period that she was in school. Though there is some case-law support for the proposition that denial of back pay

may be appropriate if a plaintiff voluntarily withdraws from the job market and seeks to obtain greater future benefits by enrolling in school full time, courts generally allow back pay if the plaintiff enrolls in school only after a diligent but fruitless search for employment. *See Miller v. AT&T Corp.*, 250 F.3d 820, 839 (4th Cir. 2001). The evidence demonstrates that Plaintiff continued to diligently search for employment, and TDCJ failed to establish that Plaintiff did not mitigate her damages. Accordingly, the Court concludes that she is entitled to back pay for the entire thirteen months that she was unemployed.

Plaintiff testified that she began looking for a job as soon as she got home. Tr. 256. She testified that she got unemployment for a while.[4] Tr. 256. She went on numerous interviews and job inquiries, but did not find a job for thirteen months. Tr. 256, 261.

Plaintiff testified that she was making $2,679 a month ($32,148 annually) gross salary at TDCJ. Tr. 259. She also received $28 a month in hazardous duty pay. Tr. 259. Plaintiff also testified that she received $160 per month in retirement contributions. Tr. 262. Plaintiff stated that she would have received a $100 per month pay raise had she stayed at TDCJ. Tr. 263. Plaintiff eventually got a job at the Workforce Commission, making a gross salary of $25,000 annually. Tr. 260. Plaintiff had that job for eight weeks. Tr. 260. She left the Workforce Commission because she found another job at Buckner Children and Family Services, where she made $26,900 a year. Tr. 260. She worked there for four months. Tr. 261. Plaintiff then went to work for the County on

---

[4] Plaintiff was unemployed for thirteen months, and she testified that she received some unemployment compensation. However, TDCJ introduced no evidence regarding the amount of unemployment compensation Plaintiff received, nor did TDCJ raise any argument that Plaintiff's back-pay award should be reduced by the unemployment compensation. Because there was no argument or evidence concerning the amount of unemployment compensation, the Court cannot offset the backpay award.

January 4, 2005 making $1,259 every two weeks ($32,734 annually), and was still working there at the time of trial. Tr. 261, 265. Plaintiff testified that the County also makes pension contributions, but at five or four percent. Tr. 266. Plaintiff also stated that the pay difference between her pay now and the pay she would have been getting at TDCJ was two or three hundred a month. Tr. 267.

The Court concludes that the evidence supports the jury's award of $45,000 in back pay. Accordingly, the Court will not reduce the award.

**E. Front Pay**

Front pay is a form of equitable relief contemplated by Title VII and is intended "to compensate the plaintiff for lost future wages and benefits." *Green v. Administrators of Tulane Educ. Fund*, 284 F.3d 642, 658 (5th Cir. 2002). "[F]ront pay may be awarded if reinstatement is not feasible" because a hostile relationship exists between the employer and the plaintiff. *Id.* Plaintiff does not believe reinstatement is feasible. Tr. 267. However, inasmuch as Plaintiff's current wages exceed her past TDCJ salary, the Court declines to award front pay.

## Conclusion

Defendant's Motion for Judgment Notwithstanding the Verdict (docket no. 60) is DENIED in all respects. The Court will enter a judgment separately in accordance with the verdict.

It is so ORDERED.

SIGNED this 16th day of October, 2006.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE